## Nerren v. Commonwealth.

(Decided May 21, 1937.)

HERSCHEL T. SMITH for appellant.

HUBERT MEREDITH, Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE RATLIFF—Affirming.

The appellant has appealed from a judgment of the Fulton circuit court convicting him of the crime of detaining a woman against her will and sentencing him to two years in the penitentiary.

The sole ground insisted on for reversal of the judgment is that the evidence is insufficient to sustain a conviciton.

The prosecuting witness, Miss Dorothy McCormick, but later married and now Dorothy McCormick Abernathy, testified that on the night of July 20, 1935, she slept on a pallet in the living room which was the front room of her father's home in Hickman, Ky., as it was her custom to do occasionally in hot weather, and at about daylight on the morning of the 21st of July, she was awakened by some one striking her on the head and face. She said she first received a blow on the side of her head which partly awakened her, which was immediately followed by another blow on the nose. She raised up and screamed calling to her brother, father, and mother, and at about that time she saw a slim man in her room, dressed in dark trousers and a light shirt, and he immediately went out through the front door, but she did not recognize him. She said that the blow on the side of her head raised a lump or knot and the blow on the nose produced a severe laceration, and it bled profusely. She claimed that her nose was broken, but the doctor who treated her wound did not say whether or not her nose was broken, but it appears from his evidence that she was severely injured. This is about the substance of her testimony in so far as it is pertinent to the issue.

Mr. and Mrs. McCormick, father and mother of the prosecuting witness, testified that they were awakened by the screams of their daughter and hastened into her room. Mrs. McCormick said that just immediately

following the screams of her daughter and before she entered her daughter's room, she heard the screen door slam, but Mr. McCormick said that he was attracted by the screams of his daughter and excited and he did not recall hearing the slam of the door. Mrs. McCormick further testified that she had cleaned out the stove and had put the soot in a "stewer" or kettle and set it outside the back door, and before the doctor and officers arrived, whom they called immediately after the attack, she noticed that the vessel containing the soot had been knocked over and a part of the soot was still in the vessel and a part of it on the ground. This was between the McCormick home and the home of Mrs. Jonakin, to whose evidence we will later refer. She said she saw flat tracks on her porch and on the walk. Mr. McCormick's testimony relating to the soot was about the same as that of Mrs. McCormick, except he did not notice it until Charles Moore, a deputy sheriff who had been called to the premises, called his attention to it.

Mrs. Jonakin, who lived in an adjoining house, possibly about 50 feet from the McCormick home, testified that she heard the screams of Miss McCormick and she immediately ran out of the house and saw a man running from the front of the McCormick home and pass between her home and the McCormick home; that he had on a light shirt, but because of certain obstructions she could not see the lower part of his body and did not know the color of his trousers.

Charles Moore, a deputy sheriff, testified that he was called to the McCormick home and found tracks made by house slippers on the sidewalk leading to the McCormick home and onto the porch. He said the tracks were "headed" toward the porch, and then he (the witness) went around to the screened windows, and the corner of the screen had been pulled loose and pushed inside toward the room about six or eight inches.

A barn had burned in town that morning and appellant was at the fire dressed in dark trousers and a light knitted undershirt only and wearing house slippers with straight or flat bottoms without heels. It appears that the description of the intruder and the flat tracks aroused the suspicions of the officers, and

they, suspecting that appellant might have been the intruder, set out to find him.

Mr. Moore further testified as follows:

"A. * * * I went to Mr. Nerren's (meaning appellant's father's) place of business and called him out and told him what had happened and I told him I wanted him to go to his house with me, and as we were going in there was a bedroom slipper on the step and one on the porch, and after we went in I told his wife what had happened up at McCormick's and asked her what time Jimmie came home.

"Q. What did you do then? A. I asked if Jimmie was there and she said, yes, in his room and I got Mr. Wahl and we went in Jimmie's room and he was on the bed with his undershirt on and in his stocking feet and was lying there with his right hand across his breast and on this part of his hand there was soot, he was sooty all over, and on this hand there looked like a print of a screen and he turned his hand over and these knuckles were bruised."

He further said that appellant's undershirt was of light color and his trousers were dark. He never examined the slippers very carefully but did observe that they made a flat track, similar to the tracks found at the McCormick home.

Joe Wahl, another deputy sheriff, testified that he went to the Nerren home with the witness, Charles Moore, and his testimony relating to the house slippers and the description of appellant with reference to soot being on his hands and body was in substance the same as the testimony of Moore.

Appellant, testifying in his own behalf, said that he was very drunk on the night of July 20th, and when asked if he remembered that night he said he remembered only a part of it. He testified that he went to the fire and was dressed in an undershirt, dark trousers, and house slippers; that he tried to help fight the fire but was too drunk. He helped to handle the fire hose, which was "muddy and sooty." After the fire was over he went to a doctor's office with a boy named Glazer, a member of the fire department, who had stuck a nail in his foot. He said he stayed in the doctor's office

about 15 minutes, then went back to the place of the fire. He then started home and fell down and lay there for a while, but he did not know how long. He said he remembered getting up and going home to get another drink of whisky and that he was sick and drunk and when he "came to" he was in jail. He said he did not go to the McCormick home on the morning in question and did not know that the prosecuting witness was there, and that he had not been at her home in three years and had not as much as had a conversation with her for several weeks or months, and never on any occasion talked to her more than just to speak to her.

On cross-examination appellant testified that he heard the fire whistle and went to the fire, but he was so drunk he could not tell just when the fire started but it was some time after midnight. He admitted that he was not too drunk to hear the fire whistle, or go to the fire, or to put on his house slippers and trousers, and not too drunk to go to the doctor's office with the Glazer boy. He said he did not know whether or not he had soot on him when he took his clothes off. He said that he took a bath after he was put in jail and was dirty. He indicated that if there was soot on him he had gotten it off the fire hose.

Other witnesses called for appellant testified to having seen him at the fire, and only one of them said that he saw him handle the fire hose. Others said he was there but they did not see him doing anything.

The deputy sheriffs, Moore and Wahl, were recalled by the Commonwealth, and after qualifying as reputation witnesses, they testified that appellant's general reputation for morals, honesty, and veracity was bad. Also, Wood Tipton, police judge of Hickman, Pat Henry, a justice of the peace, Judge Walker, county judge of Fulton county, and Fatty Barbar, a constable of Fulton county, all testified that appellant's reputation for morals, truthfulness, and veracity was bad.

One or two other neighbors testified that they heard the disturbance at the McCormick home and that they went out and looked around but saw no one. However, this negative evidence is of but little importance when measured to the direct positive evidence of those who testified that they did see a man running from the McCormick home immediately after the disturbance, and

the description of the fleeing man corresponded with the description of appellant.

The appellant attempts to account for the soot being on him by saying that he got it off the fire hose, but he does not attempt to account for the screen prints found on his hands and his bruised knuckle. From the nature of the wound inflicted on the prosecuting witness, evidently she was struck a hard blow such as would inflict a bruise on the fist or knuckle of the intruder who struck her. Also the "flat" tracks found about or near the McCormick home corresponded with the house slippers found at appellant's home, and the description of the clothes and manner of dress of appellant, and the time he returned from the fire to his home, correspond with the time the prosecuting witness was assaulted and with the description of the intruder discovered by her and Mrs. Jonakin. The facts and circumstances are so well connected that there can be no reasonable doubt that the evidence is sufficient to warrant the jury to find that the appellant was the guilty intruder who assaulted the prosecuting witness.

But it is insisted by counsel for appellant that if it be conceded that the evidence is sufficient to warrant a conviction of any offense it should have been for assault and battery only, but that the evidence is wholly insufficient to support the verdict of the jury finding appellant guilty of detaining the prosecuting witness for the purpose of having carnal knowledge of her.

The court instructed the jury on all phases of the case. Instruction No. 1, in substance, authorized the jury to find appellant guilty of a felony if it believed from the evidence that he assaulted the prosecuting witness with the purpose or intention of having carnal knowledge of her; and by instruction No. 2 the jury was told in substance that although they may believe beyond reasonable doubt that appellant assaulted the prosecuting witness but not with intent to have carnal knowledge of her, they should find him guilty of assault and battery, an offense included in the indictment, which is punishable by fine and imprisonment only. Instruction No. 3 was the usual reasonable doubt instruction as to the degree of the offense, and by No. 4 the jury was told that if it had a reasonable doubt of defendant having been proven guilty, they would find him not guilty.

Upon the evidence adduced and under the instructions of the court, the jury believed and so found that defendant did assault the prosecuting witness with intent to have carnal knowledge of her.

In Jones v. Com., 121 Ky. 266, 89 S. W. 174, 28 Ky. Law Rep. 213, the prosecuting witness was riding horseback. The defendant mounted his horse and faced her in the middle of the road. She undertook to pull to one side and he approached nearer. She finally rode around him out of the highway and ran her horse, pursued by him until she came in sight of her father's house. This was held to be a detention within the meaning of the statute. In Gibson v. Com. 104 S. W. 351, 31 Ky Law. Rep. 945, the defendant went to the residence of the prosecuting witness' father inquiring if he was at home; she told him that he was not and to return the following morning. He then went to a tree nearby and afterward returned to the house. The only persons in the house were three young ladies who closed and fastened the doors and windows. Defendant tried to force the doors and windows but was unable to enter. Two men came by and he ran off. This was held to be within the statute. In Copenhaver v. Com., 104 S. W. 750, 31 Ky. Law Rep. 1161, and in McKey v. Com., 145 Ky. 450, 140 S. W. 658, the facts relating to the conduct of the men toward the prosecuting witnesses in those cases respectively are similar to those in the other cases cited above, and were held sufficient to sustain a conviction for detaining a female against her will.

In the present case there is evidence that the screen door entering directly into the prosecuting witness' room had been forced open and the intruder went to prosecutrix' bed and assaulted her by striking her. It is argued that the striking of the prosecuting witness by the intruder in the manner described did not indicate that he desired or attempted to have sexual intercourse with her.

However, motive or intent may be inferred from the circumstances and conduct of a party, and since the intruder forcibly entered the house and went to the bed where prosecutrix was asleep and assaulted her, it was sufficient to warrant the jury to infer or believe that his purpose in the house was to have intercourse with the prosecutrix. The Statute, section 1158, under which

appellant was indicted, has been liberally construed by the courts, and actual intent being somewhat difficult to prove, the jury will be allowed a reasonably wide range in which to infer intent from the circumstances and conduct of a man toward a woman. Our conclusion is, therefore, that the evidence is sufficient to sustain the verdict of the jury.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.